Filed 11/13/20  P. v. Ramirez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RICARDO RAMIREZ,<br><br>    Defendant and Appellant. | D074948<br><br><br>(Super. Ct. No. SCD273033) |


APPEAL from a judgment of the Superior Court of San Diego County, Melinda J. Lasater, Judge.  Affirmed.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Kelley A. Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Defendant Ricardo Ramirez appeals from a judgment entered after a jury found him guilty of ten counts of sexual offenses committed against two of his young nieces. After the jury convicted Ramirez on all of the charged counts, the trial court sentenced him to state prison for a term of 150 years to life.

On appeal, Ramirez raises two claims. First, Ramirez contends that his convictions must be reversed because the trial court failed to fully instruct the jury on the statutory elements of an uncharged offense. Pursuant to Evidence Code section 1108, the trial court permitted the prosecution to introduce evidence of an incident involving sexual conduct that Ramirez was alleged to have committed against one of his nieces, but for which he was not charged. Rather than provide the jury with the statutory elements of any specific uncharged offense, the trial court suggested a modification to the instruction in which the court would provide the jury with factual details of the incident from which the jury would presumably be able to determine whether the elements of an uncharged offense or offenses were met. Ramirez's attorney agreed with the court's modification and consented to the instruction as given. On appeal, Ramirez contends that the instruction was incomplete because it did not include the general statutory elements of any uncharged offense, and asserts that the error is structural, requiring reversal per se, because the trial court "t[ook] the fact-finding role away from the jury on these crucial allegations." We reject Ramirez's contention because it conflates a failure to instruct on the elements of a charged offense and a failure to do so with respect to the elements of an uncharged offense. We further conclude that Ramirez has forfeited this contention on appeal by

2

consenting to the instruction without objection, and that even if we were to assume error, there is not a reasonable probability that but for the error, the defendant would have obtained a more favorable result.

Ramirez's second contention is that the trial court abused its discretion in granting the prosecution's request to utilize the services of a therapy support dog during one of the child victim's testimony. According to Ramirez, the relevant statute requires the demonstration of "a case-specific need for a support dog," and no such demonstration was made, resulting in a lack of substantial evidence to support the court's ruling. We conclude that the record provides a sufficient showing of the benefit of a therapy dog for the child victim in the case, as required by the statute. We further conclude that even if we were to presume error, Ramirez has not demonstrated that he was prejudiced by the presence of a therapy dog during the trial testimony of one of the child victims.

Given our rejection of Ramirez's appellate contentions, we affirm the judgment.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

Ramirez lived with his wife and their son B. in a townhouse in Rancho Peñasquitos in San Diego. Ramirez's niece K.O. lived next door with her parents, and another niece, L.G., lived down the street with her parents.

1. *The facts underlying the offenses against K.O.*

K.O. was born on January 22, 2006. At the time of trial, K.O. was 12 years old and in seventh grade.

Ramirez and his wife are K.O.'s godparents. Ramirez began sexually abusing K.O. when she was in kindergarten. At trial, K.O. described some of

3

the abuse that occurred around the time she was in third grade. According to K.O., she would often walk over to Ramirez's home to play with B., who was an infant at the time. There were occasions on which Ramirez was the only adult present when K.O. went to his home. On those occasions, Ramirez would distract B. by putting him in front of computer videos. Ramirez would then take K.O. into his bedroom, lock the door, remove her clothes, and remove his own clothes. Ramirez would tell K.O. to lie on an air mattress that was in the room. He would then lie on top of her, inserting his penis into her vagina. Sometimes, however, rather than taking off K.O.'s clothes, Ramirez would tell K.O. to take off her own clothes, and she would do what he told her to do. Ramirez did this to K.O. "[a] lot" while she was in third grade and continuing until she was in fifth grade. K.O. testified that she felt Ramirez's penis "against [her] vagina" "[m]ore than 20 times." According to K.O., when she was in fourth grade, Ramirez was engaging in this conduct with K.O. about once a week.

Ramirez would also touch K.O.'s breasts when she was undressed during these encounters. One time Ramirez put his penis inside of K.O.'s anus, and it hurt her. On at least another five occasions, Ramirez's penis touched K.O.'s anus but he did not insert it.

K.O. recalled two times when Ramirez told her not to tell her parents about what was happening. However, K.O. finally decided to tell her mother about what Ramirez was doing "[b]ecause [she] just had enough of it, and [she] didn't want to go through it" anymore. In July 2017, K.O. told her mother that Ramirez had been "abusing" her and that he had raped her. K.O.'s mother called her brother, L.G.'s father, and told him what K.O. had disclosed to her. The following morning, K.O.'s mother contacted the police.

4

K.O. suspected that Ramirez was doing similar things to L.G. because at one point, Ramirez asked K.O. whether L.G. had "ever talked to [her] about this."

A few days later, K.O. was examined and interviewed at Rady Children's Hospital. K.O.'s physical exam was "normal." The examiner explained that "a normal examination doesn't really help as much in knowing whether a child was sexually abused or not" because "there's a whole bunch of reasons why a person might have [a] normal examination even after they have been sexually -- they say they've been sexually penetrated." For example, sometimes the hymen can be torn, but it "heals up, and you can't tell that it's ever been torn." Another reason could be that the penetration occurred without causing injury because "the tissue stretched out of the way."

During an interview conducted by a forensic interviewer at Rady Children's Hospital, K.O. indicated that Ramirez had begun abusing her when she was five or six years old and in Kindergarten. She further indicated that Ramirez continued to abuse her "for many years" and said that the abuse had happened "very often." K.O. told the interviewer that, at times, when she did not want to go with Ramirez into the bedroom, he would pull her into the room by her arms. Ramirez would then close the door and lock it. K.O. also said that Ramirez would remove her clothes and underwear, and would then remove his own pants and underwear. He would lie on top of K.O. and touch her breasts with his hands. He would also touch her inner thighs, and then he would force his penis into her vagina. K.O. told the interviewer that what Ramirez did made her feel "disturbed and uncomfortable." K.O. also indicated that she felt scared. K.O. told the interviewer that Ramirez tried to put his penis in her "back" "part." She further stated that Ramirez would sometimes force her to kiss him.

5

2. *The facts underlying the offenses against* L.G.

L.G. was born on August 25, 2001, and was 17 at the time of trial. Her parents are K.O.'s mother's brother and sister-in-law. She testified about four specific incidents during which Ramirez had abused her.

The first incident occurred when L.G. was approximately six or seven years old and was at her aunt and Ramirez's house playing with K.O. At some point, L.G. and K.O.'s aunt left the apartment, and Ramirez took L.G. into his bedroom. L.G. sat on Ramirez's bed. Ramirez took her wrists in his hands, raised her arms, and pinned her down on the bed. Ramirez then got on top of L.G. He rubbed "his crotch" on L.G.'s "crotch" in a circular motion. They were both fully clothed. L.G. testified that she "didn't really know what was going on," so she "just stayed there." At multiple points, Ramirez asked her if she "liked it," but she did not respond. According to L.G., she "could very clearly hear heavy breathing" from Ramirez. After a few minutes, K.O. walked into the room; at that point, Ramirez stopped what he was doing to L.G., stood up, and they "went about [their] day."

L.G. described the second incident as having occurred when she was at Ramirez's house, while her aunt was in the shower. L.G. was in Ramirez and her aunt's bedroom, sitting on the bed watching a movie. Ramirez was sitting on a chair at a computer that was near the bed. Ramirez called for L.G. to come over to the computer, saying, "[C]ome look at this." L.G. "scooted to the edge of the bed" in order to look at the computer screen. She saw a naked woman performing oral sex on a naked man. At the time, L.G. "didn't know what it was," but she knew that "there was a man and a woman and they were both unclothed and she was doing something to his genitalia." By the time of trial, L.G. understood that the woman was "performing oral sex" on the man. In response to seeing what was on the computer screen,

6

L.G. "was just shocked," although she "didn't really know what it was because [she] was so young." However, it made her "uncomfortable, and weirded out[,] so [she] looked away."

A little bit later, Ramirez stood up, "took out his genitalia," and said to L.G., " 'It's your turn.' " L.G. saw that Ramirez's penis was erect. She immediately looked away. She was again "in shock and uncomfortable." He then "put his genitalia back into his pants, and he sat back down." Soon thereafter, L.G.'s aunt came into the room after her shower.

The third incident also occurred at Ramirez's house. L.G.'s aunt left to go to work. L.G. was sitting on the couch. Ramirez was holding B., who was about six months old at the time, and asked L.G. if she wanted to hold B. L.G. said that she did. As Ramirez went to place B. on L.G.'s lap, two of Ramirez's fingers "brushed" across L.G.'s vagina.

The fourth incident occurred at L.G.'s house, when B. was still a baby. L.G.'s family held a family gathering, and everyone, including Ramirez, was in the living room. L.G. was in her bedroom. When she left her bedroom to go to the living room, she passed Ramirez, who was opening a bathroom door in the hallway. As she passed him, Ramirez put his hand on L.G.'s back, then "groped [her] crotch." L.G. explained at trial that Ramirez "grazed his fingers on [her] crotch," from "the vagina back to the anus." L.G. "immediately opened the door [to the living room] as quickly as possible."

L.G. disclosed the abuse to her mother after learning that K.O. had told her mother that Ramirez "had molested her." On July 15, 2017, L.G.'s mother came to her room and sat on L.G.'s bed. She told L.G. what K.O. had disclosed. L.G.'s "heart dropped" and she "felt like [she] got a knot [in her] stomach because [she] knew that it had happened to [her] too." When L.G.'s mother asked whether something similar had happened to her, L.G. "didn't

really say anything," but she thought that "[b]ecause [she] was crying already," her mother "knew something had happened to [her]." L.G. eventually did tell her mother "that it had happened, and he had done something to [her] before," but she "wasn't descriptive or anything."

3. *Ramirez's admissions to a social worker and police*

After K.O.'s family reported Ramirez's sexual abuse to police, Steven Garcia, a social worker for the County of San Diego Child Welfare Services, spoke with Ramirez about the allegations that both K.O. and L.G. had made. In response to K.O.'s allegations, Ramirez told a social worker that "[K.O.] and him had a relationship," but he denied that he ever penetrated K.O.'s vagina. Ramirez stated that the "first incident" happened in January 2017, after K.O. had returned from a trip to Mexico, and that she "looked more [like] an adult than a minor." According to Ramirez, K.O. was in his room and she "pretty much . . . looked excited, and it got to the point where they ended up without clothes," and then she "grabbed his penis and rubbed it against her vagina." Ramirez did not explain to the social worker how either his own or K.O.'s clothing had been removed.

Ramirez also told the social worker about a second incident that occurred approximately five weeks before the interview took place. During this incident, according to Ramirez, he was in his bedroom playing with his son when his son left to play with his computer. After his son left the room, K.O. pulled her underwear to the side and began rubbing Ramirez's penis against her vagina. In a third incident, Ramirez explained that he and K.O. were fully clothed when he began rubbing K.O.'s inner thigh. K.O. then grabbed Ramirez's penis and rubbed it against her vagina. Ramirez told Garcia that there had been four to six incidents of K.O. rubbing his penis

8

against her vagina while they were clothed, but he said that he could not recall the details of the other incidents.

Ramirez told Garcia that all of L.G.'s allegations were false. He did mention an incident, however, involving his son B., when B. was a newborn. According to Ramirez, the baby was falling and "he reached to catch [B.] and . . . he accidentally -- from what he remembers -- brushed her thigh[,] but [he] denied that he ever touched her vagina."

Ramirez was taken into custody and was interviewed by police. During approximately the first half hour of the interview, Ramirez denied all of the allegations that had been made against him. After that, Ramirez began to talk "about how he may have accidentally touched certain parts of [K.O.'s] body." Ramirez eventually admitted that "one time [he] gave in," but claimed that K.O. had "provoked it." He told investigators that K.O. "threw herself on top of [him]" and that she "took out [his] penis," but he then clarified that K.O. had "touched [his] penis on top of [his] pants." When the investigators told Ramirez that they knew there had been skin to skin contact, he eventually said that his "penis touch[ed] her vagina without clothes, skin to skin" for "seconds." He continued to assert that he had not penetrated her vagina.

As the interview continued, Ramirez conceded that there had been "a couple" of incidents of non-skin-to-skin contact, but claimed "it[ had] been a long time" since that occurred. He admitted that on one occasion, K.O. had her clothes on, and on another occasion, there was contact "without clothes." He explained that during one incident, K.O. did not have clothes on and he had his zipper down, and his penis only went "on top" of her vagina. Toward the end of the interview, Ramirez said that he touched K.O.'s vagina with his penis four times and claimed "[i]t was just like a grazing." He conceded that

9

what he did with K.O. "really isn't correct," and he stated that he felt "bad" and "very confused" about what had happened. He then added that K.O. had "allowed it" to happen, that she had "initiated it," and that she had "provoke[d]" him.

Ramirez told police that he had never touched L.G. inappropriately, but admitted that he had kissed her on the cheek once. He "noticed that she didn't like it," and he believed that she had told her parents about it. When speaking of L.G., Ramirez stated, "That girl is a big liar." At the end of the interview, Ramirez wrote two letters, one to K.O., and one to his wife and son. In the letter to K.O., Ramirez said that he felt "very bad for what happened," asked her to forgive him, and stated, "If I have to pay in some way, I will." In the letter to his wife and son, Ramirez said that he had "let [them] down," and asked them to forgive him for his "wrong steps."

4. *Ramirez's trial testimony*

At trial, Ramirez recanted his prior admissions and denied having had any sexual contact with either girl. Ramirez stated that everything he had told the investigators during his police interview was a lie. He said that he felt that he had to say what the police wanted to hear because, he claimed, they were intimidating him and threatening his family. Ramirez testified that he did not recall talking to a social worker about the allegations, and that he did not recall admitting to that social worker that he had engaged in sexual contact with K.O.

B. *Procedural background*

On September 6, 2018, a San Diego County jury convicted Ramirez of two counts of sexual intercourse with a child 10 years old or younger (Pen.

10

Code,[1] § 288.7, subd. (a); counts 1–2); sodomy with a child 10 years old or younger (§ 288.7, subd. (a); count 3); four counts of forcible lewd acts upon a child (§ 288, subd. (b)(1); counts 4–7); and three counts of lewd acts upon a child (§ 288, subd. (a); counts 8–10). In connection with counts 4, 5, 6, 7, and 10, the jury found true the allegation that Ramirez had substantial sexual conduct within the meaning of section 1203.066, subdivision (a)(8). In connection with counts 4, 5, 6, 7, 8, 9 and 10, the jury found true the allegation that Ramirez committed the offenses against more than one victim, within the meaning of section 667.61, subdivisions (b), (c), and (e).

The trial court sentenced Ramirez to state prison for an indeterminate term of 150 years to life.

Ramirez filed a timely notice of appeal.

## III.

## DISCUSSION

A. *In consenting to the form of the challenged instruction regarding uncharged sexual conduct admitted pursuant to Evidence Code section 1108, Ramirez has forfeited his claim on appeal that the instruction was erroneous; however, even if we presume that the court erred in its phrasing of this instruction, Ramirez cannot demonstrate prejudice*

Ramirez contends that the trial court prejudicially erred by instructing the jury with CALCRIM No. 1191A without providing the general statutory elements of any specific uncharged sexual offense.[2]

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

[2] The parties disagree as to whether the evidence of uncharged conduct that was admitted at trial constituted a single uncharged offense or instead, two different uncharged offenses. The People assert in briefing that Ramirez's conduct in displaying pornography to L.G. and exposing himself to

11

The prosecution was granted leave to introduce evidence of uncharged conduct committed by appellant for the purpose of allowing the jury to find that appellant was predisposed to commit the charged offenses under Evidence Code section 1108.[3] The uncharged conduct was introduced via

_____

her constituted a single violation of section 288.2, subdivision (a)(2), and that it is this offense to which the trial court was referring when it instructed the jury pursuant to CALCRIM No. 1191A. Ramirez contends that the conduct testified to with respect to the pornography incident constituted two separate offenses. However, Ramirez did not identify the two offenses in his opening brief. After the People asserted in their brief that the uncharged conduct was admitted as evidencing a single uncharged offense under section 288.2, subdivision (a)(2), Ramirez suggested in reply that the displaying of pornography constituted a violation of section 288.2, subdivision (a)(2), and that the displaying of his erect penis constituted a violation of section 314, which makes it unlawful to, among other things, "willfully and lewdly . . . [¶] . . . [e]xpose[ ] his person, or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby." Ramirez thus argues that the trial court erred in failing to instruct the jury as to the elements of these offenses. The record is unclear with respect to which offense or offenses the trial court was relying on in admitting the uncharged sexual conduct. As we describe further in section III.A.1, the court referred to "crimes" and "offenses" in its jury instruction pertaining to the uncharged conduct evidence. The record is unclear, however, as to what the court and the parties intended with respect to the particular uncharged offense or offenses at issue. Nevertheless, as we will explain, we conclude that ultimately, whether one or both of the offenses mentioned above were at issue does not alter the outcome of this appeal. Even if Ramirez's displaying his penis were treated as a separate uncharged offense under section 314, rather than as evidence pertaining to the elements of a violation of section 288.2, subdivision (a)(2), any error in failing to instruct on the elements of section 314 is harmless for the same reasons that we conclude the failure to instruct on the elements of section 288.2, subdivision (a)(2) is harmless.

[3] Evidence Code section 1108 provides in relevant part: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made

12

L.G.'s testimony that on one occasion, Ramirez beckoned her to view sexually explicit matter on the computer that he was using and then displayed his erect penis to her, telling her that it was " '[her] turn.' "

1. *Additional relevant background*

Prior to trial, the People moved in limine to admit evidence of Ramirez's "uncharged sexual offense pursuant to Evidence Code § 1108." (Boldface & some capitalization omitted.) The People's brief mentioned "numerous acts of fondling and kissing" with respect to K.O., even though the prosecution had "elected to charge a limited number of offenses." The People's brief also specifically referred to "one occasion when [L.G.] was [a] child, [in which] the defendant showed her pornography and asked her to touch his exposed penis." The People's briefing did not identify or mention which specific offense or offenses the conduct at issue might constitute.

During pretrial discussions about the parties' various motions in limine, the trial court raised the issue of the People's motion to admit evidence of uncharged sexual conduct. Defense counsel objected to the admission of evidence of uncharged acts, arguing that it would be more prejudicial than probative under Evidence Code section 352. The trial court rejected this argument and concluded that the uncharged acts evidence that the People had mentioned, which would not require the testimony of any additional witnesses, would be admissible.

The uncharged acts that were admitted pursuant to Evidence Code section 1108 and that were referred to in the challenged jury instructions were those that were introduced via L.G.'s testimony. During that testimony, L.G. mentioned an incident involving Ramirez, for which no charges were

_____

inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (*Id.*, subd. (a).)

13

filed in this case, in which Ramirez showed her pornography on his computer, and then exposed his erect penis to her.

During the discussion regarding jury instructions, the trial court told the attorneys: "I'm going to give [CALCRIM No.] 1191([A]). Please look at your e-mails.[4] I really, really didn't want to use code sections and official definitions. I wanted to give descriptive terms. [¶] We know it's a potential uncharged crime. . . . So I opted to use descriptive acts as opposed to code sections and code titles." The court continued, "The phraseology I use is the People presented evidence that the defendant committed the crimes of displaying pornographic material to [L.G.] and exposing [his] penis to [L.G.] and saying, 'It's your turn,' that we're [*sic*] not charged in this case. These crimes are -- actually, I would delete that period. And then you may consider this evidence only if the People prove it, et cetera. Just use the standard instruction."

Defense counsel replied, "That's fine, [Y]our Honor." The prosecutor also agreed with the court's proposed phrasing of the instruction. The court then said, "I think it's going to be easier to deal with in your arguments that way."

The court instructed the jury pursuant to CALCRIM No. 1191A, as follows:

---

4    The e-mails that the trial court mentioned are not included in the record on appeal. We remind the parties that *any* discussions regarding jury instructions between the court and attorneys, whether oral and reported on the record or in writing, are of assistance to a reviewing court in understanding the court's decisions regarding those jury instructions. Such communications should be made part of the record on appeal because they are relevant to this court's ability to adequately address a claim involving a challenge to the jury instructions.

14

"The People presented evidence that the defendant committed the crimes[5] of displaying pornographic material to [L.G.] and exposing his penis to [L.G.] and saying, 'It's your turn,' that were not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged offenses. [¶] Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not [that] the fact is true. If the People have [not] met this burden of proof, you must disregard this evidence entirely. If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or [inclined] to commit sexual offenses and based on that decision also conclude that the defendant was likely to commit the charged offenses as charged here. [¶] If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all of the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged offenses. The People must still prove the charge beyond a reasonable doubt."

---

5      The trial court referred to "crimes" and "offenses" in its jury instruction pertaining to the uncharged conduct evidence. However, all of the conduct that the trial court referred to—i.e., evidence of Ramirez displaying the pornographic video, exposing his penis, and making the comment " 'It's your turn' "—could provide the elements of a single violation of section 288.2, subdivision (a)(1), as we describe below. Given that we lack a record as to what the court and the attorneys discussed in their e-mail exchanges, we cannot be sure which uncharged offenses the court believed were at issue. Ultimately, we conclude that it is not material to our analysis because Ramirez cannot demonstrate that he was prejudiced by the court's failure to instruct on either of the two possible uncharged offenses.

15

2. *Analysis*

Ramirez argues that the trial court's instruction failed to provide the jury with the elements of any uncharged offense with respect to the uncharged conduct of displaying pornography and exhibiting his penis to L.G. CALCRIM No. 1191A, which must be given whenever evidence of uncharged sexual offenses has been introduced, provides, in its standard form:

> "The People presented evidence that the defendant committed the crime[s] of <insert description of offense[s]> that (was/were) not charged in this case. (This/These) crime[s] (is/are) defined for you in these instructions.
>
> "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense[s]. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.
>
> "If the People have not met this burden of proof, you must disregard this evidence entirely.
>
> "If you decide that the defendant committed the uncharged offense[s], you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit [and did commit] <insert charged sex offense[s]>, as charged here. If you conclude that the defendant committed the uncharged offense[s], that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of <insert charged sex offense[s]>. The People must still prove (the/each) (charge/ [and] allegation) beyond a reasonable doubt.

16

"[Do not consider this evidence for any other purpose [except for the limited purpose of <insert other permitted purpose, e.g., determining the defendant's credibility>].]"

The Bench Notes accompanying CALCRIM No. 1191A, include the following paragraph discussing the court's duty with respect to instructing the jury as to each uncharged offense:

> "Evidence Code section 1108(a) provides that 'evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101.' Subdivision (d)(1) defines 'sexual offense' as 'a crime under the law of a state or of the United States that involved any of the following[,]' listing specific sections of the Penal Code as well as specified sexual conduct. In the first sentence, the court must insert the name of the offense or offenses allegedly shown by the evidence. The court **must** also instruct the jury on elements of the offense or offenses."

Ramirez asserts that by failing to provide the elements of any specific Penal Code provision or provisions, the trial court "t[ook] the fact-finding role away from the jury on these crucial allegations, [and thereby] deprived appellant of his right to a jury trial." He argues that this is "structural error," requiring automatic reversal, or alternatively, that it constitutes the denial of his right to a fair trial, and thus implicitly contends that the *Chapman* standard of prejudice should apply.

### a. *This claim was forfeited*

As the People point out, Ramirez did not object to the instruction or request that the trial court instruct the jury on the elements of any uncharged offenses. Rather, Ramirez specifically agreed with the court's proposed modification of CALCRIM No. 1191A.

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general *or incomplete*

17

unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012, italics added; *People v. Jennings* (1991) 53 Cal.3d 334, 374 [failure to object to court's proposed special instruction forfeits claims on appeal.) Ramirez's contention is that the instruction regarding uncharged acts evidence admitted pursuant to Evidence Code section 1108 was incomplete because it failed to inform the jury of the elements of the uncharged offenses. Ramirez's failure to object to the incompleteness of the instruction in the trial court, and the resulting failure to give the court an opportunity to correct any perceived error in the instruction, results in forfeiture of that contention on appeal.

Ramirez nevertheless contends that forfeiture should not apply. According to Ramirez, the trial court's "failure to instruct the jury on *any* of the elements of the two offenses constituted structural error and requires reversal per se," and maintains that the defect was "not subject to waiver by his trial counsel alone, as it amounted to a concession of guilt." Ramirez's argument conflates two different concepts. Evidence of uncharged offenses presented pursuant to Evidence Code section 1108 does not subject a defendant to criminal punishment for the conduct comprising the uncharged offenses; rather, if determined to be true, such a finding creates merely a permissive inference of guilt as to the charged offenses. As the trial court informed the jury, a defendant's commission of an uncharged offense may be established by only a preponderance of evidence, demonstrating the significant distinction between uncharged and charged offenses. The jury was instructed that evidence of an uncharged offense, alone, is insufficient to establish guilt as to a charged offense. (See CALCRIM No. 1191A ["[A conclusion that the defendant committed the uncharged sex offense] is not sufficient by itself to prove that the defendant is guilty of <insert charged sex

18

offense[s]>.  The People must still prove (the/each) (charge/ [and] allegation) beyond a reasonable doubt"].)  Thus, a defendant is *not* subject to criminal liability merely as a result of a finding that he or she committed an uncharged sexual offense, and any instructional error related to the elements of uncharged offenses necessarily is *not* equivalent to instructional error involving the elements of charged offenses.  (See *People v. Jandres* (2014) 226 Cal.App.4th 340, 359 (*Jandres*) [flawed version of CALCRIM No. 1191 identifying uncharged offense that was not a sexual offense did not violate defendant's right to due process by relieving prosecution of its burden of proof on charged offenses].)  " '[T]here is no reasonable likelihood [an erroneous] instruction on uncharged offenses relieved the prosecution of its burden of proof with respect to the charged offenses' " because "[p]ropensity [is], of course, not an element of any of the charged crimes." (*Ibid.*)  The failure to object to instructional error related to uncharged offenses is therefore not akin to "a concession of guilt," as Ramirez suggests, and the complained-of error may be subject to the usual rules for forfeiture of a claim.

We reject any implicit suggestion from Ramirez that his unpreserved claim of instructional error is subject to review because the question affects his substantial rights.  (See § 1259.)  A defendant's substantial rights are affected if an erroneous instruction results in a miscarriage of justice under the (*Watson*) standard of prejudice review—i.e., if it is reasonably probable that a jury would have reached a more favorable result absent the error. (*People v. Rivera* (1984) 162 Cal.App.3d 141, 146.)  As we discuss further in part A.2.b, *post*, Ramirez cannot demonstrate that it is reasonably probable that a jury would have reached a more favorable result if the trial court had instructed the jury regarding the elements of the uncharged offenses identified by the parties.

19

b. *Even if we presume error, Ramirez cannot demonstrate prejudice*

When a defendant contends that a jury instruction was erroneous, a reviewing court must determine whether there is a reasonable likelihood that the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial, and the arguments of counsel. (*Estelle v. McGuire* (1991) 502 U.S. 62, 70–75; *People v. Wilson* (2008) 44 Cal.4th 758, 803.) Instructions should be interpreted to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) An appellate court reviews the correctness of jury instructions de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

There is no dispute that the modified CALCRIM No. 1191A instruction properly informed the jury as to how it should consider the evidence of an uncharged offense and the burden of proof with regard to that evidence. What Ramirez challenges is the manner in which the trial court identified the uncharged conduct at issue and specifically, the court's failure to provide the elements of any uncharged sexual offense. Although the Use Notes to CALCRIM No. 1191A state, in relevant part, that the "court **must** also instruct the jury on [the] elements of the offense or offenses" (Bench Notes to CALCRIM No. 1191A), the trial court did not instruct the jury on the elements of any uncharged offense. Instead, the court informed the jury that the uncharged offense or offenses consisted of Ramirez "displaying pornographic material to [L.G.] and exposing his penis to [L.G.] and saying, 'It's your turn.' "

The elements of the offense of displaying harmful material in violation of section 288.2, subdivision (a)(1) are: 1. The defendant exhibited harmful

material to another person by any means; 2. When the defendant acted, he knew the character of the material; 3. When the defendant acted, he knew, should have known, or believed that the other person was a minor; 4. When the defendant acted, he intended to arouse, appeal to, or gratify the lust, passions or sexual desires of himself or of the other person; and, 5. When the defendant acted, he intended to engage in sexual intercourse, sodomy, or oral copulation with the other person or to have either person touch an intimate body part of the other person. (See CALCRIM No. 1140; § 288.2, subd. (a)(2).) Material is considered "harmful" for purposes of the offense if "1. It shows or describes sexual conduct in an obviously offensive way; 2. A reasonable person would conclude that it lacks serious literary, artistic, political, or scientific value for minors; AND 3. An average adult person, applying contemporary statewide standards, would conclude it appeals to prurient interest." (CALCRIM No. 1140.) The elements of the offense of exposing oneself in violation of section 314 are "[t]he defendant willfully exposed his genitals in the presence of another person or persons who might be offended or annoyed by the defendant's actions" and that "[w]hen the defendant exposed himself, he acted lewdly by intending to direct public attention to his genitals for the purpose of sexually arousing or gratifying himself or another person, or sexually offending another person." (CALCRIM No. 1160.) The trial court did not provide the jury with the elements of either of these offenses, and thus, the jury was not instructed to decide whether all of these elements, including the intent elements, had been established by a preponderance of the evidence. This was error.

Although the trial court erred in failing to instruct the jury with respect to the elements of an uncharged offense or to link those elements to the conduct that the court described in the instruction it gave, Ramirez

21

cannot demonstrate that the error was prejudicial. "[I]nstructional error[, including instructional error associated with uncharged offense evidence] is assessed under the *Watson*[6] reasonable probability standard," pursuant to which prejudicial error exists only where it is reasonably probable that the jury would have reached a result more favorable to the appellant in the absence of the error. (*Jandres*, *supra*, 226 Cal.App.4th at p. 359; see *People v. Falsetta* (1999) 21 Cal.4th 903, 924–925 [applying *Watson* prejudice review standard to alleged error in failing to instruct jury on proper use of propensity evidence].)

First, while the trial court did not instruct the jury on the elements of a section 288.2, subdivision (a)(2) offense, the court's description of the conduct at issue essentially tracked the elements of an offense under that statute.[7] L.G. described Ramirez calling her over to look at pornography that he was viewing on a computer screen; the pornography involved a naked woman orally copulating a naked man. Ramirez then displayed his own erect penis and told L.G. that it was " '[her] turn.' " The pornography that Ramirez displayed to L.G. easily falls within the offense's definition of "harmful material." Further, Ramirez's displaying his erect penis and his comment to L.G. indicated his intention to gratify his own sexual desires, and his intention to engage in oral copulation with L.G. It is not reasonably probable that a jury would have rejected the conclusion that Ramirez committed an uncharged violation of section 288.2, subdivision (a)(1) if it believed that he engaged in the conduct that L.G. described, as summarized in the trial court's

---

6     *People v. Watson* (1956) 46 Cal.2d 818, 836–837 (*Watson*).

7     At least one of the elements, i.e., that L.G. was a minor when the conduct occurred, was clearly not in dispute.

instruction.  The only real question was whether the jury believed that this incident occurred, and it is clear that the jury believed L.G.'s testimony over Ramirez's since it convicted Ramirez of all of the charged offenses for which she was the victim.[8]

The same is true with respect to the failure to instruct on the elements of a section 314 offense.  The elements of section 314 are that "[t]he defendant willfully exposed his genitals in the presence of another person or persons who might be offended or annoyed by the defendant's actions" and that "[w]hen the defendant exposed himself, he acted lewdly by intending to direct public attention to his genitals for the purpose of sexually arousing or gratifying himself or another person, or sexually offending another person." (CALCRIM No. 1160.)  For the same reasons we conclude that Ramirez cannot demonstrate that he was prejudiced by the failure to instruct the jury with respect to an uncharged violation of section 288.1, subdivision (a)(1), Ramirez also cannot demonstrate that he was prejudiced by the failure to instruct on the elements of a section 314 offense.  Again, the issue would have been whether the incident occurred as L.G. described it; if the jury believed that it did occur in the way in which L.G. described, there is no reasonable probability that the jury would have concluded that Ramirez did not violate section 314, even if it had been instructed on the elements that comprise a section 314 offense.

Second, this case involved overwhelming evidence supporting the jury's guilty verdicts on all counts.  At trial, both K.O. and L.G. testified in great

---

[8]    It is also possible that defense counsel's decision to agree to the trial court's modification of the instruction to omit the lengthy generic elements of the offense had a strategic purpose, because having a jury spend more time focusing on these elements would have served only to highlight the conduct at issue and give it even more importance at trial.

detail about Ramirez's sexual abuse. A video of K.O.'s interview at the hospital was also admitted, and K.O.'s statements during that interview were consistent with her trial testimony. In addition, Ramirez admitted engaging in criminal sexual contact with K.O. on at least four to six occasions, both during an interview with a social worker and with police investigators, though he denied penetrating her vagina with his penis. Ramirez also wrote a letter to K.O., asking her to forgive him, and wrote a letter to his wife essentially admitting that he had engaged in inappropriate conduct. The testimony from both girls was specific, and Ramirez's admissions gave credence to the testimony of the victims, even if his admissions were not consistent with their testimony in certain particulars. We conclude that it is not reasonably probable that the jury would have reached a result more favorable to Ramirez if the trial court had provided an instruction that included all of the elements of either of the possible uncharged offenses.

B. *The trial court did not err in granting the prosecution's request to have a therapy dog at K.O.'s feet while she testified; even if we were to presume error, Ramirez cannot demonstrate prejudice*

Ramirez contends that the trial court failed to require the prosecution to present facts indicating a case-specific need for the use of a therapy dog before granting the prosecution's request that a therapy dog be permitted to be present with the victims while they testified at trial.[9] According to Ramirez, the "statute imposes a duty on the movant to produce evidence showing the use of a support dog is warranted," and, he argues, the lack of such evidence in this case means that trial court's exercise of discretion is "not supported by substantial evidence" (boldface & some capitalization

---

[9] The People's motion requested the use of a therapy dog's services for both victims at trial. However, the therapy dog was ultimately utilized only during K.O.'s testimony.

omitted).  Ramirez contends that the lack of "substantial evidence of a case-specific need for a support dog . . . demonstrates a manifest abuse of discretion by the trial court in granting the motion without an evidentiary basis."  He argues that the trial court's error with respect to the therapy dog prejudiced him because the dog's presence made K.O. a more sympathetic witness and more likely to be believed.

1.  *Additional background*

Before trial, the People moved pursuant to section 868.4 for permission to have a therapy dog present in court for the victims during their testimony.  A therapy dog had been present during both victims' testimony at the preliminary hearing.  In the People's motion, the People argued that "[t]estifying in court can be a terrifying process, especially for children who may have to testify against a relative or friend of the family."  The People further noted that "a therapy dog would reduce anxiety [and] assist the witness in testifying."

During discussions of the parties' in limine motions, the issue of the therapy dog was raised.  Ramirez's attorney objected to the use of a therapy dog, arguing that "it's a bit of overkill in this case," that "it's just going to elicit sympathy for the alleged victims in this case," and that "this potential sympathy card" would undermine Ramirez's "right to a fair trial and due process."  According to defense counsel, both girls had testified at the preliminary examination and "at no point . . . did they ever become emotional or needed a break or anything like that or even go over and interact with the therapy dog."

The trial court asked for the People's response, but interposed a question about where the therapy dog had sat "during the preliminary hearing."  The prosecutor indicated that the therapy dog "assisted one, if not

25

both, of the child witnesses," and was seated at the feet of the witness during the witness's testimony, while the handler sat "against the wall of the witness stand." The prosecutor touched on the qualifications of the dog and trainer, and then stated, "[The dog] was of aid to the victims -- both before and during the hearing . . . ." The prosecutor also mentioned that a jury instruction that was "new this year," "specifically states that the jury cannot use the presence of the support dog in any way . . . for other reasons that would be prejudicial to the defendant," and argued that there is "existing case law permitting the presence of a support dog in cases precisely like this one."

The court concluded that it would allow the therapy dog to be present as long as the dog was sitting at the child's feet and the handler was behind the child.

As K.O. took the stand, the court admonished the jury as follows: "Ladies and gentlemen, the witness will be accompanied by a support dog. You're to ignore the dog. Don't take anything – there's no implication in having the dog present. That's to be disregarded by you in the testimony." In addition, included in the jury instructions was the following instruction: "[K.O.] had a dog present during her testimony. Do not consider the support dog's presence for any purpose."

2. *Analysis*

The trial court approved the use of a therapy dog for twelve-year-old K.O. pursuant to section 868.4. Section 868.4 provides, in pertinent part:

> "(a) If requested by either party in a criminal or juvenile hearing, and if a therapy or facility dog is available to the party within the jurisdiction of the judicial district in which the case is being adjudicated, the following individuals shall be afforded the opportunity to have a therapy or facility dog accompany him or her while testifying in court, subject to the approval of the court:

26

"(1)  A child witness in a court proceeding involving any serious felony, as defined in subdivision (c) of Section 1192.7, or any violent felony, as defined in subdivision (c) of Section 667.5.

"(2) A victim who is entitled to support persons pursuant to Section 868.5, in addition to any support persons selected pursuant to that section.

"(b) Before a therapy or facility dog may be used pursuant to subdivision (a), the party seeking to utilize the therapy or facility dog shall file a motion with the court, which shall include the following:

"(1) The training or credentials of the therapy or facility dog.

"(2) The training of the therapy or facility dog handler.

"(3) Facts justifying that the presence of the therapy or facility dog may reduce anxiety or otherwise be helpful to the witness while testifying.

"(c) If a party, pursuant to subdivision (b), makes a showing that the therapy or facility dog and handler are suitably qualified and will reasonably assist the testifying witness, the court may grant the motion, unless the court finds the use of a therapy or facility dog would cause undue prejudice to the defendant or would be unduly disruptive to the court proceedings.

"(d) The court shall take appropriate measures to make the presence of the therapy or facility dog as unobtrusive and nondisruptive as possible, including requiring the dog to be accompanied by a handler in the courtroom at all times.

"(e) If a therapy or facility dog is used during a criminal jury trial, the court shall, upon request, issue an appropriate jury instruction designed to prevent prejudice for or against any party."

The prosecutor requested the presence of a therapy dog during the trial. The prosecutor stated in the motion that a dog was available within the jurisdiction where the trial would take place and provided facts regarding the training and credentials of the therapy dog and its handler. It is undisputed that K.O. was a child witness in a court proceeding involving serious felonies, as set forth in section 868.4, subdivision (a)(1).[10]

Although there were not abundant facts presented to "justify[ ] that the presence of the therapy or facility dog may reduce anxiety or otherwise be helpful to the witness while testifying," the motion did include the prosecutor's contention that "[t]estifying in court can be a terrifying process, especially for children who may have to testify against a relative or a friend of the family," as in this case, and the fact that "a therapy dog would reduce anxiety [and] assist the witness in testifying." Additionally, in argument before the trial court, the prosecutor noted that both victims had utilized the services of a therapy dog during their preliminary hearing testimony, and that the dog's services were "of aid to the victims -- both before and during the hearing . . . ."

Although minimal, this showing was sufficient to meet the requirements of section 868.4, subdivision (b)(3). The fact that the same child victim for whom the request was made for a therapy dog at trial utilized one during the preliminary hearing and found the dog to be of aid constitutes justification that the presence of a therapy dog may be helpful to her while testifying at another proceeding. Ramirez suggests that his attorney's argument that the two girls testified at the preliminary hearing "without

---

[10] Section 868.4, subdivision (a)(1) refers to the "serious felonies" outlined in section 1192.7, subdivision (c), which includes, among other felonies, any "lewd or lascivious act on a child under 14 years of age."

emotional difficulty" and purportedly "did not interact with the dog in any manner" provided a "factual basis for his objection, and not just a conclusion." However, the fact that both victims utilized a therapy dog and seemed to be able to testify well and without significant emotional outbursts could be viewed as demonstrating the success of the therapy dog services, rather than a demonstration that the dog's services were not necessary or helpful. The court could have relied on the fact that the child victim for whom the dog's services were being requested at trial used the dog's services during her prior testimony and found those services to be "of aid . . . both before and during the hearing," in exercising its discretion to permit the therapy dog to be utilized at trial for that young witness.

Even if we were to assume for purposes of argument that the People did not provide a sufficient factual justification for the trial court's exercising its discretion to allow the use of a therapy dog for a minor witness who otherwise met the requirements of section 868.4, subdivision (a), Ramirez has not demonstrated that the presence of the therapy dog during K.O.'s testimony was prejudicial to him. Although Ramirez does not offer the relevant standard of prejudice review that he believes applies to his claim of error, it is clear that he is not arguing that this error would be anything other than an error of state law. If error is found under state law, it is assessed for prejudice using the standard described in *People v. Watson* (1956) 46 Cal.2d 818, with the question being "whether defendant has established there exists a reasonable probability he would have obtained a more favorable result if the error had not occurred." (*People v. Moore* (2011) 51 Cal.4th 1104, 1130.) We therefore apply the *Watson* standard of prejudice review to determine whether the error asserted was harmless.

Ramirez posits that the child victim "would be seen by the jurors in a more sympathetic light with the presence of the therapy dog at [her] side, which had the potential to be the deciding circumstance in the jurors' minds." He suggests that because "dogs[ ] play an important role in the lives of a large percentage of the population," this "presents the opportunity for a juror to be swayed by something other than the evidence at trial." We reject Ramirez's argument. First, the contention that the presence of a therapy dog sitting at a child witness's feet would be "the deciding circumstance in the juror's minds" as to whom to believe is pure speculation. The dog was utilized only during K.O.'s testimony, not L.G.'s, yet the jury clearly believed L.G.'s testimony, as well. Further, it is not surprising that the jury believed the testimony of both victims—not because a therapy dog was present during one of the victim's testimony, but because Ramirez's testimony was contradicted by his own statements to both a social worker and police investigators. Although Ramirez claimed at trial that he just told the police investigators what they wanted to hear, he had no explanation for his statements to the social worker, and claimed not to recall even having spoken to the social worker.

A second reason Ramirez's argument is without merit is that the jury was specifically instructed not to consider the presence of the therapy dog for *any* purpose. We presume the jury followed the court's instructions. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 139 [the presumption that jurors understand and follow instructions is " '[t]he crucial assumption underlying our constitutional system of trial by jury' "].) A conclusion that the jury would have weighed K.O.'s testimony as more credible as a result of the presence of a therapy dog would contravene the presumption that jurors understand and follow the court's instructions; we decline to reach such a

30

conclusion. It is not reasonably probable that Ramirez would have obtained a more favorable result if the court had declined to permit the use of the therapy dog's services during K.O.'s testimony. Thus, any error in permitting a therapy dog to be present in court during K.O.'s testimony was harmless.

## IV.

## DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:

BENKE, Acting P. J.

DATO, J.

31